# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
March 1, 2016 Session

## IN RE ESTATE OF CALVERT HUGH FLETCHER

**Appeal from the Circuit Court for Putnam County**
**No. 18589      Steven D. Qualls, Judge**

_____

**No. M2015-01297-COA-R3-CV – Filed May 23, 2016**
_____

This appeal stems from probate proceedings in the Putnam County Probate Court. During the course of the trial proceedings, an issue arose as to the ownership of a certificate of deposit titled in the decedent's name. Following an evidentiary hearing, the trial court entered an order concluding that the certificate of deposit was, in fact, the property of the decedent's estate. On appeal, the decedent's surviving wife argues that because the funds within the certificate of deposit were derived from a joint marital account, they should have been impressed as entireties property. We agree and conclude that the funds in the certificate of deposit passed to the surviving wife upon the decedent's death. The judgment of the trial court is accordingly reversed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY ARMSTRONG, J., joined.

Kenneth S. Williams, Cookeville, Tennessee, for the appellant, Nelda Karene (Kay) Fletcher.

Henry D. Fincher, Cookeville, Tennessee, for the appellees, Elaine Fletcher, Janet L. Fletcher Brady, Richard H. Fletcher, and Peter J. Fletcher.

Jerry Bowers, Appellee.[1]

_____

[1] Appellee Jerry Bowers did not file a brief or otherwise participate in this appeal.

Carolyn Smith, Appellee.[2]

**OPINION**

**Background**

This case raises an interesting question regarding property classification and the manner in which a tenancy by the entirety in bank funds can be terminated. The pertinent background facts are fairly straightforward. On April 3, 2012, spouses Nelda Karene Fletcher ("Mrs. Fletcher") and Calvert Hugh Fletcher ("Mr. Fletcher") refinanced the mortgage on their home. With the proceeds from the refinancing, the Fletchers opened a joint checking account with rights of survivorship at FSG Bank in Cookeville, Tennessee. The initial deposit was over $100,000.00. According to the Fletchers' account agreement, only one owner's signature was required to make a withdrawal from the account.

In January 2013, Mr. Fletcher withdrew $100,000.00 from the FSG joint account in order to fund a certificate of deposit ("CD") issued by FSG. The CD was titled solely in Mr. Fletcher's name and was used as security for a line of credit that was also solely in his name. It is undisputed that Mr. Fletcher never drew on the line of credit secured by the CD.

In February 2013, the Fletchers' joint account at FSG was closed, and following an extended illness, Mr. Fletcher died testate on September 6, 2013. Under his last will and testament, Mrs. Fletcher was to receive all of his tangible personal property. The remainder of Mr. Fletcher's estate was to be divided equally among his four adult children ("the Fletcher Children").[3] On November 22, 2013, Mrs. Fletcher filed a petition to probate her deceased husband's will in the Putnam County Probate Court. Shortly thereafter, on November 26, 2013, the trial court admitted the will into probate and appointed Mrs. Fletcher as executrix for the estate.

As the probate proceedings progressed, the classification of the CD became a point of contention. On March 25, 2014, Mrs. Fletcher filed an extensive inventory of the estate. Although the CD was listed among the assets included within the inventory, it was specifically identified as a non-estate asset. In a May 8, 2014 petition, Mrs. Fletcher contended that the CD should be treated as property that passed to her at Mr. Fletcher's death because the monies that funded the CD had been taken from a joint marital account. On

---

[2] Appellee Carolyn Smith did not file a brief or otherwise participate in this appeal.

[3] The Fletcher Children are the product of Mr. Fletcher's first marriage. Mrs. Fletcher, the Appellant in this case, was his second wife.

- 2 -

February 16, 2015, the Fletcher Children filed an answer and counter-complaint to Mrs. Fletcher's May 8, 2014 petition. Therein, they denied that the CD was anything other than estate property.

On April 22, 2015, the trial court held a hearing to decide how the CD should be classified.[4] In addition to receiving documentary exhibits into evidence, the trial court heard oral testimony from Mrs. Fletcher and two of the Fletcher Children. Although many topics concerning the CD were addressed at the hearing, much of the testimony related to a phone call that took place in April 2013, a time period during which Mr. Fletcher was ill with pneumonia. Because of Mr. Fletcher's illness, one of his daughters, Elaine Fletcher ("Elaine"), came to visit him and assist Mrs. Fletcher with financial issues. In pertinent part, Elaine sought to help Mrs. Fletcher find funds to pay back $10,000.00 owed on a loan to one of Mr. Fletcher's creditors. In the process of trying to locate funds for this purpose, both Elaine and Mrs. Fletcher talked to Howard Bilbrey, an officer at FSG Bank, by phone.[5] Although there is no dispute that Mrs. Fletcher spoke with Mr. Bilbrey first and that Elaine spoke with him shortly thereafter, their respective testimony presents slightly different accounts of what Mr. Bilbrey related to them personally.

According to Mrs. Fletcher, Mr. Bilbrey never informed her that Mr. Fletcher had moved money from their joint account into a separate CD. She testified that she was under the impression that she could withdraw funds from the joint account as long as both she and Mr. Fletcher signed for a withdrawal. As she explained:

> So I called Howard [Bilbrey]. And I said, "I need to draw down $10,000 on the money market fund that we have at your bank." I didn't know that the account had been closed. I didn't know that it was in a CD. I'm a total idiot in that point. I didn't know that. He didn't tell me that. I asked him if I could borrow from it. So, and he didn't indicate to me anything at all that had changed from the original time. And he agreed that I could take down the $10,000 at that point.

---

[4] Although other issues remained pending in the case, they were reserved for future adjudication.

[5] We note that during Elaine's testimony, Elaine stated that she could not recall if Mr. Bilbrey was the person to whom she spoke. Specifically, she testified as follows: "I spoke to a high bank official. The name has been provided by [Mrs. Fletcher]." There does not appear to be any dispute, however, that Elaine actually spoke with Mr. Bilbrey. The Fletcher Children's brief, for example, repeatedly references the phone conversation as having taken place with Mr. Bilbrey.

After Mrs. Fletcher finished her phone call with Mr. Bilbrey, a conversation eventually ensued between Elaine and Mr. Bilbrey. As Mrs. Fletcher testified:

> After I spoke with Howard Bilbrey and he agreed that we could pull down the money, I went into my kitchen. [Elaine] was sitting at the counter in my kitchen. And I related to her that Howard had said that I could get the money. And at some point, she said -- she asked me if there was a service fee or anything of that nature. And I said, "Well, I didn't ask. I don't know." So she picks up the phone, and she calls him. And they chitchat. And the end result was, she said, "Well, we don't want to do that. We are not going to draw the money down because we don't want to do that. Because we don't want to pay a penalty." And that's when the decision was made not to take the $10,000 from the account.

As is evident from the following exchange, Elaine testified that Mr. Bilbrey provided her with different information than that which was supposedly given to Mrs. Fletcher:

> Q      Okay. What was the information that you received on that call?
>
> A      He told me that the money was in a CD.
>
> Q      Okay.
>
> A      And that it would be difficult to take out, as a result. That there might be a fee involved. But the more, standing out more in my mind was that we'd have to bring a notary over to witness the signature on the withdrawal to the nursing home. And that seemed like an onerous process.

Elaine testified that she relayed the contents of her conversation with Mr. Bilbrey to Mrs. Fletcher after she got off the phone.

At the conclusion of the April 22 hearing, the trial court ruled that the CD was the property of Mr. Fletcher's estate. In pertinent part, the trial court concluded that Mrs. Fletcher had acquiesced to Mr. Fletcher's establishment of the CD. Moreover, by referencing *Mays v. Brighton Bank*, 832 S.W.2d 347 (Tenn. Ct. App. 1992), the trial court determined that the funds from the Fletchers' joint account at FSG ceased to be part of an estate by the entireties once Mr. Fletcher withdrew them. On June 15, 2015, the trial court

entered an order memorializing its April 22 oral ruling.[6]  Finding that there was "no just reason for delay," the trial court certified the order as final pursuant to its authority under Rule 54.02 of the Tennessee Rules of Civil Procedure.  This appeal followed.

## Issues Presented

In her appellate brief, Mrs. Fletcher presents three issues for our review, restated verbatim as follows:

1.  Whether the Probate Court applied the wrong burden of proof in evaluating ownership of the CD at issue in this case.

2.  Whether or not money withdrawn from a tenancy by the entirety account by a husband without knowledge, permission or consent of his wife, and placed in a CD in his name only, will be impressed with the entirety provision at his death.

3.  Whether or not a wife, through silence or inaction, can acquiesce to her husband's change of character of tenancy by the entirety funds even though the husband had the lawful power to transfer those funds without her consent.

As stated in their appellate brief, the Fletcher Children raise the following issues:

1.  Will the law equitably convert property owned by one (1) spouse into entireties property when the banking statutes say otherwise?

2.  If so, what chaos will be inflicted on the banking industry as a result?

3.  What burden of proof must be met to equitably convert title from one person's ownership to another: clear and convincing evidence, substantial evidence or preponderance of the evidence?

4.  When a husband and wife sign an agreement permitting the other to withdraw all of the account at any time, is that permission for the withdrawal?

---

[6] The trial court's June 15 order purported to incorporate findings from an attached "Exhibit 1," which was said to contain the transcript of the trial court's oral ruling.  Although no such exhibit was attached to the order when we initially reviewed the record transmitted to us on appeal, a supplemental record has since been filed demonstrating that the trial court clerk has re-entered the order with the transcript from the incorporated oral ruling attached.

5.  When a spouse knew or should have known that money was transferred from a joint account to a separate account, and fails [to] object to it for up to a full year, is that effective consent to the transfer?

6.  When the Court makes findings that a spouse was not credible in her testimony, and that she knew about the transfer despite her testimony to the contrary, will the Court of Appeals disturb these credibility findings when the Court of Appeals has no opportunity to observe the witness's demeanor?

### Standard of Review

"In a civil case heard without a jury, we review the trial court's findings of fact *de novo* upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise." *Moore v. Houston Cnty. Bd. of Educ.*, 358 S.W.3d 612, 615 (Tenn. Ct. App. 2011) (citing Tenn. R. App. P. 13(d)). When the credibility of in-court witnesses is at issue, "considerable deference must be accorded to the factual findings of the trial court." *Fritts v. Safety Nat'l Cas. Corp.*, 163 S.W.3d 673, 678 (Tenn. 2005) (citations omitted). In contrast, when we review the trial court's resolution on a question of law, no presumption of correctness attaches to the trial court's legal conclusions. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000).

### Discussion

Although several matters are presented for our review through the parties' briefs, they all speak to one dispositive issue before us: whether the CD is the property of Mr. Fletcher's estate. Most of the facts pertaining to this issue are not in controversy. Indeed, there is no question that Mr. and Mrs. Fletcher, as husband and wife, opened a joint bank account at FSG with rights of survivorship. Moreover, there is no dispute that the funds deposited within this account were held by the Fletchers as tenants by the entirety. Nor is there any dispute that the account agreement provided both spouses with the unilateral right to withdraw funds. Additionally, it is undisputed that Mr. Fletcher withdrew $100,000.00 from the marital bank account to fund a CD titled in his name alone at FSG.

Although the above-recited facts are undisputed, the legal effect remains a point of contention. Whereas Mrs. Fletcher maintains that the funds in the CD should have passed to her outside of probate at Mr. Fletcher's death, the Fletcher Children argue that this Court should uphold the trial court's finding that the CD belongs to Mr. Fletcher's estate.

To support their position that the CD belongs to Mr. Fletcher's estate, the Fletcher Children argue, as a matter of law, that once funds are withdrawn from a marital account by

one of the tenants and reduced to that tenant's separate possession, those funds cease to be a part of an estate by the entireties. Although this legal proposition is not without some basis in law, there is a lack of unanimity on such a rule across jurisdictions. Indeed, in reviewing case law from other jurisdictions, it appears that some courts have adopted it, whereas other courts have not. *Compare, e.g.*, *McEntire v. McEntire's Estate*, 590 S.W.2d 241, 244 (Ark. 1979) ("An estate by the entireties in a bank account differs in one significant aspect from such an estate in real property in that the estate exists in the account only until one of the tenants withdraws such funds or dies leaving a balance in the account. Funds withdrawn or otherwise diverted from the account by one of the tenants and reduced to that tenant[']s separate possession ceases to be a part of the estate by the entireties."), *with Matter of Morrow's Estate*, 570 P.2d 912, 914 (N.M. 1977) (stating that the act of withdrawing all the money from a tenancy by the entirety account does not destroy the estate by the entireties). Under existing Tennessee jurisprudence, there is an absence of consistency and clarity on the issue. There are conflicting decisions emanating from this Court on the topic, and although the Tennessee Supreme Court has referred to the issue on several occasions, it has never definitively decided it. In order to understand the unsettled nature of the question before us, an overview of Tennessee law in this area is appropriate.

A "[t]enancy by the entirety is a form of property ownership unique to married persons." *Catt v. Catt*, 866 S.W.2d 570, 573 (Tenn. Ct. App. 1993). Under this form of ownership, "each party owns the whole, and on death of one of the parties, the survivor takes no new title or estate because the survivor is in possession of the whole from its inception." *Id.* (citation omitted). "[I]t is well-settled in Tennessee that personal property, as well as realty, may be owned by spouses by the entirety." *Id.* (citations omitted). Moreover, this Court has previously noted that once a tenancy by the entirety is created, it can only be terminated when "both [spouses] convey, when one spouse dies and the survivor becomes owner of the whole, or when the survivorship is dissolved by divorce and the parties become tenants in common in the property." *White v. Watson*, 571 S.W.2d 493, 495 (Tenn. Ct. App. 1978).

Although it is now a common legal understanding that spouses may hold bank funds as tenants by the entirety, that question was not definitively decided in Tennessee until our Supreme Court's decision in *Sloan v. Jones*, 241 S.W.2d 506 (Tenn. 1951). In that case, the Tennessee Supreme Court expressly held, for the first time, that a tenancy by the entirety could be created "in a deposit in a bank." *Sloan v. Jones*, 241 S.W.2d 506, 507 (Tenn. 1951). In the course of its discussion, the *Sloan* court referenced a decision from the Pennsylvania Supreme Court, *Madden v. Gosztonyi Savings & Trust Co.*, 200 A. 624 (Pa. 1938). Although our Supreme Court appeared to reference *Madden* for the sole purpose of supporting the conclusion that funds within a bank account could be held by the entireties, it also quoted

- 7 -

language from *Madden* that is directly relevant to the issue before us. In pertinent part, the *Sloan* court stated as follows:

> The Supreme Court of Pennsylvania in Madden v. Gosztonyi Sav. & Trust Co., 331 Pa. 476, 200 A. 624, 630, 117 A.L.R. 904, has held that bank deposits payable to the husband and wife, or to the husband or wife, are held by them as tenants by the entireties, with all the incidents thereof. Unity of control in the case of deposits payable to either being found in the implication of authority in one to act for both. That Court, among other things, said: "When, on the other hand, an account is made payable in its creation to either 'husband or wife', there is an immediate expression of authority, of agency to act for both. As an incident of these estates by entireties is the power that each gives the other, at the time of the estate's creation, to act for the other." That court then goes on and cites a number of other cases and quotes therefrom to support this statement and concludes as follows: "**Where a deposit is made payable to either spouse, agency or authority exists by implication, and the husband or the wife may, from that authority, withdraw the entire account, but the money thus withdrawn is impressed with the entirety provision that it is the property of both, and any one dealing with such specific property as severalty, knowing it belongs to both, must submit to the consequences**."

*Sloan*, 241 S.W.2d at 508-09 (emphasis added).

At issue in *Madden* was the ability of a husband and wife to recover the balance of a savings account at a bank. Although the husband in that case had entered into a waiver with the bank whereby he agreed to waive a portion of the parties' deposit incident to the bank's plan of reorganization, he and his wife later argued that this release was ineffective based on the wife's failure to join personally in the agreement. *Madden*, 200 A. at 625. Although the trial court agreed with the position advanced by the husband and wife and entered a judgment in their favor, the Pennsylvania Supreme Court reversed. *Id.* at 632. The Pennsylvania Supreme Court concluded that the trial court had "overlooked the power granted under the agency expressed in the creation of the account." *Id.* at 631. In pertinent part, it stated as follows: "Certainly the power to withdraw all of the funds includes within it the power to preserve or protect the fund and to consent to a reorganization of a 'closed' bank for that purpose[.]" *Id.* Although the Pennsylvania Supreme Court accordingly denied the husband and wife recourse against the bank, it also noted that the immunity of the bank "in no way affect[ed] the rights as between the husband and wife." *Id.* (citations omitted).

With regard to the bank account at issue in *Madden*, the Pennsylvania Supreme Court was emphatic that the funds within it represented entireties property. *Id.* at 631-32. In the

- 8 -

process of explaining that entireties ownership was not negated by the ability of one spouse to act authoritatively for both, the *Madden* court stated as follows:

> Where a deposit is payable to "husband *and* wife",—a deposit by entireties—the husband and wife may withdraw the funds if they sign together. But there is nothing in the law relating to entireties that would prevent the wife from giving the husband express authority to sign for her as her agent and withdraw for both of them, although no such authority may be implied. When, on the other hand, an account is made payable in its creation to either "husband *or* wife", there is an immediate expression of authority, of agency to act for both. As an incident of these estates by entireties is the power that each gives the other, at the time of the estate's creation, to act for the other. This conclusion is beyond debate.

*Id.* at 630. In continuing its analysis, the *Madden* court went on to pronounce the language that our Supreme Court quoted in *Sloan*:

> The authorities thus cited would seem to show that either spouse presumptively has the power to act for both, so long as the marriage subsists, in matters of entireties, without any specific authorization, provided the fruits or proceeds of such action inures to the benefit of both and the estate is not terminated. But neither may by such action destroy the true purpose of the estate by attempting to convert it or a part of it, in bad faith, into one in severalty.
>
> * * * *
>
> Where a deposit is made payable to either spouse, agency or authority exists by implication, and the husband or the wife may, from that authority, withdraw the entire account, but the money thus withdrawn *is impressed with the entirety provision that it is the property of both*, and any one dealing with such specific property as severalty, knowing it belongs to both, must submit to the consequences. However, the bank, acting in good faith, is protected when funds are withdrawn by either.

*Id.* at 630-31 (italics in original).

The *Madden* rule, which states that money withdrawn from a marital account remains entireties property, was referenced again by our Supreme Court in *Griffin v. Prince*, 632 S.W.2d 532 (Tenn. 1982). Like *Sloan*, the facts in *Griffin* did not specifically call for

application of the *Madden* rule. At issue in *Griffin* was whether an individual creditor of a husband could garnish deposits in two joint bank accounts. *Id.* at 533. Although the trial court had ruled that the entire proceeds of both accounts were subject to garnishment, our Supreme Court reversed upon concluding that the bank accounts at issue were owned by the husband and wife as tenants by the entirety. *Id.* In the course of explaining why the bank accounts were owned as tenants by the entirety, the *Griffin* court dismissed the creditor's contention that use of the word "or" between the names of the spouses on the bank accounts prevented entireties ownership:

> There is abundant authority in this state that the use of the word "or" between the names of spouses on a bank account or negotiable instrument does not preclude their ownership of the asset by the entirety and that joint property of spouses will be deemed to be so held in the absence of proof to the contrary. Probably the leading case is *Sloan v. Jones*[.]

*Id.* at 536. The *Griffin* court then proceeded to quote from the prior *Sloan* decision, including its reference to the *Madden* rule. *Id.*

Approximately a decade after our Supreme Court's decision in *Griffin*, this Court issued its opinion in *Mays v. Brighton Bank*, 832 S.W.2d 347 (Tenn. Ct. App. 1992). Although the ultimate issue in *Mays* concerned the validity of a bank's security interest in a trailer that the bank had repossessed, the case also provided an occasion for this Court to address the status of funds that had been withdrawn from a husband and wife's bank account. After stating that no Tennessee case had directly addressed the question as to how the character of such withdrawals should be treated, we acknowledged that there was a split of authority among other jurisdictions on the issue. *Id.* at 350. We noted that some courts held that a withdrawal of funds from a tenancy by the entirety account ended the other party's interest in the funds; however, we also observed that other courts held that entireties ownership continued notwithstanding a removal of funds. *Id.* Holding the former position to be the "better view," *id.*, we concluded that the wife's withdrawal of funds from a joint account eliminated the entireties nature of the money withdrawn. *Id.* at 351.

Although the rule adopted in *Mays* has not yet been overturned by the Tennessee Supreme Court, its validity has been cast into doubt on two occasions. The first criticism of *Mays* comes from our Supreme Court's 1998 decision in *Grahl v. Davis*, 971 S.W.2d 373 (Tenn. 1998). At issue in that case was whether a conservator had breached her fiduciary duty to her conservatee by allowing the conservatee's husband to "transact four certificates of deposit in which the conservatee had an interest and reinvest the funds into certificates of deposit held either solely in the name of [the conservatee's husband] or jointly in the name of [the conservatee's husband and conservator]." *Id.* at 373-74. Because the Supreme Court

ordered that the amounts redeemed from the original certificates of deposit be restored to the conservatorship estate based on its conclusion that the conservator breached her fiduciary duties, it did not need to specifically resolve the question of whether funds withdrawn from an entireties account remain impressed with an entireties provision. The Supreme Court did, however, openly question whether the rule articulated in *Mays* represented sound law:

> The intermediate court in *Mays* characterized the legal status of property purchased with tenancy by the entirety funds as a question of first impression. That precise question was not at issue in *Sloan* and *Griffin,* so technically, the characterization is correct. The intermediate court decided the issue by rejecting the decision of the Pennsylvania Supreme Court, quoted with approval in *Sloan* and *Griffin,* and by adopting instead the position of the Arkansas courts that funds withdrawn by one spouse from a tenancy by the entirety account are not impressed with the entirety provision and can not be recovered by the other spouse absent a showing of fraud. *Mays* appears to be inconsistent with this Court's prior decisions.

*Id.* at 379 n.3.

The continuing validity of *Mays* was also cast into doubt by this Court's decision in *In re Estate of Grass*, No. M2005-00641-COA-R3-CV, 2008 WL 2343068 (Tenn. Ct. App. June 4, 2008), *perm. app. denied* (Tenn. Jan. 20, 2009). Although the appeal in *Grass* involved a variety of issues related to the probate of a will, of note to our present discussion is the *Grass* court's analysis of two withdrawals from a joint bank account held by the decedent and her husband. Before the decedent in *Grass* passed away, the joint bank account had a balance of $260,000.00. *Id.* at *2. Whereas the decedent withdrew $160,000.00 from the account and placed the money into two pay on death accounts payable to her children, the husband withdrew $100,000.00 from the account and gave the money to his children from a prior marriage. *Id.*

For various reasons pertinent to the probate proceedings, the validity of these withdrawals was placed into issue. Although we ultimately remanded the case to the trial court to first determine whether or not the bank account at issue was held as tenants by the entirety, we concluded that if the bank account had been held as tenants by the entirety, the amounts withdrawn should be deemed to be impressed with an entirety provision. For example, with regard to the $160,000.00 withdrawn by the decedent, we stated as follows:

> [I]f on remand the Probate Court determines that the bank account was held by the Decedent and her Husband as tenants by the entirety, then the $160,000 was impressed with the entirety provision. As stated above, "once a tenancy

by the entirety is created, it can be terminated only when both convey, when one spouse dies and the survivor becomes owner of the whole, or when the survivorship is dissolved by divorce and the parties become tenants in common in the property." *White v. Watson*, 571 S.W.2d 493, 495 (Tenn. Ct. App. 1978). Hence, if the Probate Court determines that the Husband did not agree to the transfer of the $160,000 into two pay on death accounts for the benefit of the Decedent's children, then upon the Decedent's death, ownership of the $160,000 immediately vested to the Husband, not the Decedent's children. *Sloan*, 241 S.W.2d at 507.

*Id.* at \*14. Moreover, with respect to the $100,000.00 withdrawn by the husband, we noted:

[I]f on remand the Probate Court determines that the joint bank account was held as tenants by the entirety by the Decedent and her Husband, then the $100,000 was impressed with the entirety provision when the Husband withdrew it. To transfer money that is held as tenants by the entirety, both spouses must agree. The Probate Court stated that the money was transferred to the Husband "for his own benefit," but did not state whether the Decedent agreed to the transfer. As stated above, money withdrawn from a bank account held by a husband and wife as tenants by the entirety is impressed with the entirety provision and that anyone who receives the property knowing it is impressed with an entirety provision takes subject to the provision. *Sloan*, 241 S.W.2d at 508-09. Therefore, if the Decedent did not agree to the transfer, the $100,000 withdrawn by the Husband was impressed with the entirety provisions, and if the Husband's children knew that the property was held by the Decedent and her Husband as tenants by the entirety, then they take the money subject to the entirety provision.

*Id.* at \*32.

In reaching these conclusions, it is evident that we declined to follow the rule we articulated in *Mays* but instead followed the rule pronounced by the Pennsylvania Supreme Court in *Madden*. We observed that the *Madden* rule had been quoted with approval by our Supreme Court in *Sloan* and also noted that it had been quoted in the *Griffin* decision. *Id.* at \*13-14. Further, we observed that the *Grahl* court had highlighted the discrepancy that existed between *Mays* and the *Sloan* line of cases. *Id.* at \*14. Because we found *Mays* to be inconsistent with the Supreme Court's prior decisions, we concluded that money withdrawn from an entireties bank account remains impressed with the entirety provision. *Id.* We also explained that "anyone who receives the property knowing it is impressed with an entirety provision takes subject to the provision." *Id.* at \*32 (citation omitted).

On appeal, the Fletcher Children characterize the rule from *Grass* as a "legal fiction." They argue that an entireties provision does not attach to funds withdrawn from a marital bank account and accordingly urge us to apply the rule we previously articulated in *Mays*. Although the trial court concluded that *Mays* remains good law in light of the fact that it has not been overturned by our Supreme Court, we think that our position in *Grass* is the correct one. It is unclear to us why one spouse's withdrawal of funds from a marital bank account should automatically divest the other spouse of an ownership interest in the funds withdrawn. Again, "once a tenancy by the entirety is created, it can be terminated only when both [spouses] convey, when one spouse dies and the survivor becomes owner of the whole, or when the survivorship is dissolved by divorce and the parties become tenants in common in the property." *Watson*, 571 S.W.2d at 495. In our opinion, absent evidence of some agreement by the non-withdrawing spouse that his or her interest in the funds is to cease, we fail to see how one spouse's withdrawal of money from a martial bank account could effectively destroy the entireties character of the funds. In a tenancy by the entirety, "each party owns the whole." *Catt*, 866 S.W.2d at 573. That ownership interest should not suddenly cease because one spouse has withdrawn funds from a bank account. Nor should account agreements like the one at issue, which provides either spouse with the right to withdraw funds, be generally construed as evidencing advance consent that either spouse may terminate entireties ownership through a unilateral withdrawal. As a practical matter, such a notion would seem to be an affront to the marital expectations that spouses have. As the Pennsylvania Supreme Court stated in *Madden*:

> When . . . an account is made payable in its creation to either "husband *or* wife", there is an immediate expression of authority, of agency **to act for both**. As an incident of these estates by entireties is the power that each gives the other, at the time of the estate's creation, **to act for the other**.

*Madden*, 200 A. at 630 (emphasis added). Although the rule from *Mays* has not been specifically rejected by our Supreme Court, we find that the rule laid down in *Grass* is more consistent with the character of entireties ownership and the expectations incident thereto. Accordingly, we reject the principle from *Mays* that entireties ownership ceases when one spouse withdraws money from a marital account and reduces those funds to his or her separate possession. As a general proposition, absent an agreement from the non-withdrawing spouse that his or her ownership interest in the funds is to cease, the funds withdrawn should remain impressed with an entirety provision.

In connection with its conclusion that the CD belonged to the estate of Mr. Fletcher, the trial court incorporated oral findings from the April 22, 2015 hearing. As is evident from the incorporated ruling, there appear to be two bases for the trial court's classification of the CD. First, the trial court appears to have determined, as a matter of law, that the funds

withdrawn from the Fletchers' marital account ceased to be entireties property once they were withdrawn. Indeed, in referencing the *Mays* decision, the trial court remarked as follows:

> [T]hat case basically, according to the Court's opinion, is still the law -- even though the Supreme Court has criticized it. But they didn't overturn the case.
>
> It says, "An estate by the entireties in a bank account differs in one significant aspect from an estate in real property in that the estate exists in the account only until one of the tenants withdraw such funds or dies leaving a balance in the account. Funds withdrawn or otherwise diverted from the accounts by one of the tenants and reduced with that tenant's separate possession ceases to be part of the estate by the entireties."
>
> It goes on to say though that, "This does not mean that in a proper case under timely allegations of fraud or other such remedy that one of the co-tenants could not sustain an action to recover all or part of the funds diverted or withdrawn by the other."
>
> The Court didn't hear any proof whatsoever that Mr. Hugh Fletcher had done anything fraudulent, or tried to hide this asset from Mrs. Fletcher. It's just, it's not there.
>
> So the Court finds that the CD established by Mr. Hugh Fletcher was in his individual name at the time of his death.

To the extent the trial court's classification of the CD was predicated on the *Mays* case, we conclude that it erred. As we have emphasized, as a general proposition, funds withdrawn from a marital account remain impressed as entireties property and anyone receiving such property "knowing it is impressed with an entirety provision takes subject to the provision." *In re Estate of Grass*, 2008 WL 2343068, at *32 (citing *Sloan*, 241 S.W.2d at 508-09). *See also Madden*, 200 A. at 631 ("[T]he money thus withdrawn *is impressed with the entirety provision that it is the property of both*, and any one dealing with such specific property as severalty, knowing it belongs to both, must submit to the consequences.").

The trial court's oral ruling, however, does not appear to be limited to a simple application of the rule from *Mays*. The trial court also made findings that Mrs. Fletcher "acquiesce[d] to the CD."[7] In pertinent part, it stated as follows: "Since Mrs. Fletcher knew

---

[7] The necessity of the trial court's findings in this regard is somewhat unclear given its apparent endorsement

- 14 -

or *should have known* by the simplest of inquiries that the $100,000 was in Mr. Fletcher's individual name [but did not do anything about it for several months], that she did acquiesce to the CD." (emphasis added).

Having reviewed the trial court's findings, we conclude that they fail to demonstrate that Mrs. Fletcher ever agreed to give up her entireties interest in the funds withdrawn from the marital account. Although the trial court ultimately concluded that Mrs. Fletcher "acquiesced" to the CD, its oral ruling does not even definitively conclude that she knew the CD had been titled in her husband's name. At several points, the trial court simply referred to what she "should have known." For example, the trial court stated as follows in connection with its finding of acquiescence: "Since Mrs. Fletcher knew **or should have known** by the simplest of inquiries that the $100,000 was in Mr. Fletcher's individual name, she did acquiesce to the CD." (emphasis added) Although we would not dispute that a spouse could agree to give up his or her interest in entireties funds, there is insufficient evidence in this case that Mrs. Fletcher ever agreed to do so. As noted, the trial court did not even definitively conclude that Mrs. Fletcher knew about separate ownership of the CD.[8] The findings of the trial court thus do not present a proper basis for concluding that Mrs. Fletcher ever waived any claim of ownership in the disputed funds. Accordingly, the trial court's determination that the funds in the CD belong to Mr. Fletcher's estate is hereby reversed. Because the funds were entireties property at Mr. Fletcher's death, they now belong solely to Mrs. Fletcher.

**Conclusion**

We hereby reverse the trial court's determination that the CD belongs to the estate of Mr. Fletcher. The funds in the CD constituted entireties property at Mr. Fletcher's death and accordingly belong to Mrs. Fletcher. Costs of this appeal are assessed jointly and severally against the Appellees, Janet L. Fletcher Brady, Elaine Fletcher, Richard H. Fletcher, and Peter J. Fletcher, for which execution may issue if necessary. This cause is remanded to the trial court for the collection of costs, enforcement of the judgment, and for such further proceedings as may be necessary and are consistent with this Opinion.

_____
ARNOLD B. GOLDIN, JUDGE

---

of the rule from *Mays*. Again, under *Mays*, funds withdrawn from a martial account and reduced to one spouse's separate possession cease to be a part of an estate by the entireties.

[8] Of course, mere knowledge that funds have been withdrawn and placed in a separate individual account does not necessarily establish that the non-withdrawing spouse has agreed to relinquish his or her ownership interests. Whether consent has been given will depend on the facts of the case.